# U. S. Department of Housing and Urban Development



| Office of Public Housing | Region VIII, Denver<br>1670 Broadway<br>Denver, Colorado 80202 | Phone: 303-672-5372<br>Fax: 303-672-5065<br>Web: www.hud.gov |

**To:** Cheryl Cohen, Montana Housing Division Administrator; Michael Talia, General Counsel, Jackson, Murdo & Grant, PC

**From:** Zachary D. Urban, Director, Denver Field Office of Public Housing  *Zachary Urban*

**Date:** May 24th, 2024

**Re**: Response to Queries & Technical Assistance Requests Concerning Freedom's Path at Fort Harrison

On May 14, 2024, the Montana Department of Commerce ("Commerce" or "MDOC") requested technical assistance from HUD on the questions below.  We appreciate your patience as we reviewed these questions and coordinated to provide the responses.  This letter transmits our responses to your questions. We hope that you will find this information to be helpful.  Please let us know if you have any follow-up questions after reviewing the responses below.

1. Following up on the HUD letter dated April 17, 2024 – page 2, 4th paragraph. HUD's response stated that Commerce cannot move a family into a unit that has HQS violations or uncontrolled lead-based paint hazards. Before a family could move in, the owner would have to meet the requirements in Part 35 including clearance testing.

    a. **Does HUD draw a distinction when it comes to paying HAP on a unit, if the unit failed the lead-based paint (LBP) visual assessment during an HQS inspection** (in accordance with Form 5.2) **and a unit that contains LBP hazards identified in a Risk Assessment** (during the reevaluation at a PBV property)**?**

    No, HUD has not drawn a distinction between these specific situations. Lead-based paint hazards can be identified through visual assessments, risk assessments, or a tenant complaint. The same applies for other HQS deficiencies – they can be identified through a routine or special inspection, or by tenant complaint. For the visual assessment done with an HQS inspection, the inspector cites any deteriorated paint if the property was built before 1978. Deteriorated paint is presumed to be lead-based paint unless testing has proven otherwise. For a target housing PBV unit where a child under age 6 is expected to reside, if deteriorated paint is found in the unit or the common area servicing the unit, and no testing has proven that the deteriorated paint is not lead-based paint, there is an HQS violation regarding the PBV, at which point, the owner is not permitted to let the family move into the unit until the violation has been abated by controlling the (known or presumed) lead-based paint hazard and having the work pass clearance.  Specifically, to consider a lead-based paint hazard HQS violation corrected for such a unit, the hazard control required in 24 CFR 35.715(b) must be completed. Lead hazard control includes clearance as described at 24 CFR 35.1340.

**EXHIBIT 3**

    i. Since the timeline placed on the owner to implement interim controls and meet clearance is 12 months (see 24 CFR 35.715(b)(2)), Commerce was noting a distinction when it comes to making HAP on a unit that did not fail a visual assessment but was identified under the Risk Assessment during a reevaluation as having LBP hazards.

The regulations that allow for 12 months to complete lead hazard control in a PBV unit do not supersede the regulations at 24 CFR 983.103(c) that require that a family cannot move into a unit with unmitigated HQS violations.

    ii. The LBP hazards identified during a reevaluation (via risk assessment), do not necessitate the withholding of HAP until the proper timeline has passed for the owner to implement proper controls and clearance. The unit is not considered a HQS violation until the relevant timeline to remedy the LBP hazards has passed.

The issue of withholding HAP is not relevant, because HAP is not paid until a family moves in. If the unit is vacant, this is the best time to complete the lead hazard control because the need to provide occupant protection there are reduced requirements for occupant protection and relocation under 24 CFR 35.1345 would be reduced.  A family cannot move in until the lead hazard control is completed and clearance has been met per 24 CFR 983.103(c).

  b. Does HUD have any complaint about that interpretation and application? See PIH Notice 2017-13, page 19, last paragraph.

If this is regarding what is stated above in 1.a.ii, HUD does not concur that a family can move into a unit that has unmitigated HQS hazards. If the PHA has implemented the flexibility under HOTMA for Life-threatening/Non-Life threatening HQS deficiencies, lead-based paint hazards are categorized as "Life-threatening" conditions in PIH Notice 2017-20 that must be corrected BEFORE MOVE-IN. This is established policy; as noted, for example, in the cited notice (with boldfacing in original):

> The presence of **deteriorated paint** in units built before 1978 to be occupied by a family with a child under the age of 6, which is a LT condition under the NLT provision, is treated differently from other LT conditions. **If the PHA identifies such hazards during the initial HQS inspection, the PHA may not approve the tenancy, execute the HAP contract (or, in the case of PBV, approve occupancy and the execution of a lease), or make assistance payments until lead hazard reduction is complete.**  …

2. Following up on the HUD letter dated April 17, 2024 – bottom of page 2.

  a. HUD response: "Form HUD-52580-A does not include all the fields and requirements in 24 CFR part 35 that a PHA or owner would use for a lead-based paint visual assessment or reevaluation at a PBV property. … For compliance with part 35, we recommend that the PHA or owner follow the HUD Guidelines for Evaluation and Control of Lead-Based

> Paint Hazards in Housing, Chapter 5. For visual assessment, HUD advises the use of Form 5.2. Field Report Visual Assessment."
>
> b. Commerce asked a clarification question during our call on April 19, 2024 regarding the difference in standards between HUD-52580-A and Chapter 5 and the Form 5.2.
>    i. **Are the PBV LBP visual assessment requirements more stringent than the HCV LBP inspection requirements, or less stringent?**

If this question is about the periodic visual assessments performed by the PHA, the regulations at 24 CFR 983.103(d) apply, in addition to the regulation at 24 CFR 983.101(c) that cites the lead-based paint requirements in 24 CFR 35 Subpart H that require the owner to perform risk assessments and ongoing evaluations. The PBV requirements exceed the requirements for an HCV unit because PBVs require a Risk Assessment, which must be performed by a certified Risk Assessor and include dust and soil sampling. The owner is also required to do ongoing lead-based paint maintenance and reevaluations as described in 24 CFR 35.715(c). The "stringency" of the ongoing reevaluation requirements depends on the results of the initial Risk Assessment and the type and level lead hazard control completed, as described in 24 CFR 35.1355(b). For example, if there are lead-based paint and/or hazards that have not been permanently abated, the owner must perform annual visual assessments and perform additional lead-based paint risk assessments every two years.  The PHA can assist the owner in complying with these requirements if they perform visual assessments in the biennial inspections under [24 CFR 983.103(d)(1)](#).

HUD's specific guidance to PHAs, owners, and others on how to perform the visual assessment for lead-based paint in PBV properties is provided in its online Lead based Paint Visual Assessment Training Course at [https://apps.hud.gov/offices/lead/training/visualassessment/h00101.htm](https://apps.hud.gov/offices/lead/training/visualassessment/h00101.htm). The requirements of 24 CFR 35 Subparts H (on project-based assistance) and R (on methods to be used for various activities) apply to the owner, but PHAs are responsible for ensuring owners comply with the lead regulations. Additionally, PHAs are required to do the turnover and periodic inspections in 24 CFR 983.103.

The visual assessment requirement is established in subpart R, specifically at 24 CFR 35.1355(a)(2), as part of lead-based paint maintenance performed at unit turnover (and every twelve months); 24 CFR 35.1355 is cited by 24 CFR 35 subpart H, specifically at 24 CFR 35.715(c).  (For reference, it is cited for public housing at 24 CFR 35.1120(c) and for HCV at 24 CFR 35.1220.)  Procedures for implementing visual assessments for deteriorated paint are provided in the HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing, which are cited at 24 CFR 35.1310(a), with the Guidelines' describing the visual assessment procedures and use in section II.D, Visual Assessment, of chapter 5, Risk Assessment and Reevaluation.

3. **Is there any distinction in the legal meanings of the following terms: "suspension," "abatement," and "termination" in the context of housing assistance payments?** Their usage in the regulations seems to indicate the meaning of the terms is not synonymous.

    a. "If the PHA determines that a contract unit is not in accordance with the housing quality standards (or other HAP contract requirement), the PHA may exercise any of its remedies under the HAP contract for all or any contract units. Such remedies include <u>termination</u> of housing assistance payments, <u>abatement</u> or reduction of housing assistance payments,

      reduction of contract units, and termination of the HAP contract." See 24 CFR 983.208 [linkprotect.cudasvc.com](b)(2).

   b. "The PHA may recover any overpayment, <u>suspend</u> housing assistance payments, <u>abate</u>, or reduce the housing assistance payment, <u>terminate</u> the payment or terminate the HAP contract." See PIH Notice 2023-06 [linkprotect.cudasvc.com], page 3, paragraph 2.

HUD understands the terms "suspension," "abatement," and "termination" in the context of a housing assistance payments contract as follows:

- Suspension means that the housing assistance payments are stopped and resume after the deficiency is addressed. Under suspension, there is a potential for retroactive disbursement to the owner.

- Abatement is the stopping of housing assistance payments to an owner with no potential for retroactive payment.

- Termination has its common meaning. Once the HAP contract is terminated, PBV participation ends and tenant-based assistance under HOTMA becomes available to affected families.

Please note: PHAs generally specify the action being taken. An abatement action, for example, cannot be retroactively classified as a suspension or withholding action.